ORAL ARGUMENT REQUESTED

No. 25-3110

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

STEVEN CRUMP

*Plaintiff-Appellant,*

v.

JOHNSON COUNTY BOARD OF COMMISSIONERS, ET AL.

*Defendants-Appellees.*

On Appeal from the United States District Court
For the District of Kansas
Hon. C.J. Eric B. Melgren
No. 5:24-CV-3036

# APPELLANT'S OPENING BRIEF

Samuel Weiss
RIGHTS BEHIND BARS
1800 M Street NW Front 1 #33821
Washington, DC 20033
(202) 455-4399
sam@rightsbehindbars.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii
STATEMENT OF RELATED CASES .......... 1
JURISDICTIONAL STATEMENT .......... 1
STATEMENT OF THE ISSUES .......... 2
SUMMARY OF ARGUMENT .......... 6
ARGUMENT .......... 6
I. Questions of Material Fact Remain on Whether Crump Has a Claim Under the ADA for Failure to Accommodate .......... 6
II. .......... The District Court Erred in Granting Summary Judgment to Defendants. 14
CONCLUSION .......... 22
STATEMENT REGARDING ORAL ARGUMENT .......... 22
CERTIFICATE OF COMPLIANCE
CERTIFICATE OF DIGITAL SUBMISSION
CERTIFICATE OF SERVICE
ATTACHMENT 1: Memorandum and Order Filed 6/2/2025
ATTACHMENT 2: Judgment Filed 6/2/2025

# TABLE OF AUTHORITIES

## Cases

*Adair v. City of Muskogee*, 823 F.3d 1297 (10th Cir. 2016) .................................... 8

*Armstrong v. Schwarzenegger*, 622 F.3d 1058 (9th Cir. 2010) .............................. 11

*Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222 (10th Cir. 2009) 14

*Barker v. Osemwingie*, No. 2:16-CV-3008, 2017 WL 3454443 (E.D. Cal. Aug. 11, 2017) .................................................................................................... 20

*Barker v. Osemwingie*, No. 2:16-CV-3008, 2017 WL 3454443, at *4 (E.D. Cal. Aug. 11, 2017) ........................................................................................ 20

*Barker v. Osemwingie*, No. 20-15503, 2021 WL 5564625, at *1 (9th Cir. Nov. 29, 2021) ............................................................................................... 19, 20

*Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) ................................................ 18

*Bryant v. Madigan* 84 F.3d 246 (7th Cir. 1996) ..................................................... 18

*Dinkins v. Corr. Med. Servs.*, 734 F.3d 633 (8th Cir. 2014) .................................. 12

*Fitzgerald v. Corrections Corporation of America* 403 F.3d 1134 (10th Cir. 2005) .................................................................................................................. 17

*Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285 (3d Cir. 2019) .................................. 19

*Greer v. City of Wichita, Kansas*, 943 F.3d 1320 (10th Cir. 2019) ........................ 16

*Janny v. Gamez*, 8 F.4th 883 (10th Cir. 2021) ....................................................... 16

*Magwood v. Patterson*, 561 U.S. 320 (2010) .......................................................... 18

*Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114 (10th Cir. 2004) ......................... 13

*Morris v. California*, No. 21-16059, 2022 WL 2901730 (9th Cir. 2022) ............... 20

*Munoz v. California Department of Corrections and Rehabilitation,* 842 F. App'x 59 (9th Cir. 2021) ................................................................................... 19

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) ............................................ 9

*Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) ................................................. 11

*Pierce v. Cnty. of Orange*, 526 F.3d 1190 (9th Cir. 2008) ..................................... 12

*Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185 (10th Cir. 2007) . 7, 13

*Sanchez v. Vilsack*, 695 F.3d 1174 (10th Cir. 2012) .............................................. 16

*Simmons v. Navajo County*, 609 F.3d 1011 (9th Cir. 2010) ................................... 19

*Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321 (10th Cir. 1999) ........................................................................ 1

*United States v. Gaudin*, 515 U.S. 506 (1995) ........................................................ 13

*United States v. Georgia*, 546 U.S. 151 (2006) ........................................................ 12

*Whitesel v. Sengenberger*, 222 F.3d 861 (10th Cir. 2000) ........................................ 1

*Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067 (2018) ............................ 18

**Statutes**

28 U.S.C. § 1291 ........................................................................................ 1

28 U.S.C. § 1331 ........................................................................................ 1

28 U.S.C. § 1367 ........................................................................................ 1

42 U.S.C. § 12102(1) ................................................................................... 7

42 U.S.C. § 12102(4)(A). ............................................................................. 9

42 U.S.C. § 12134 ....................................................................................... 9

ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008) ........ 7

Pub. L. No. 110-325, 122 Stat. 3553 (2008) ................................................ 7

**Other Authorities**

28 C.F.R. § 35.108 ..................................................................................... 9

28 C.F.R. § 35.108(a)(2)(i) ......................................................................... 9

28 C.F.R. § 35.108(c)(2) ............................................................................. 9

28 C.F.R. § 35.108(c)(2)(i) ......................................................................... 9

28 C.F.R. § 35.108(c)(2)(ii) ........................................................................ 9

28 C.F.R. § 35.108(d) .................................................................................. 9, 10

28 C.F.R. § 35.152(b)(3) ............................................................................. 13

28 C.F.R. Pt. 35, app. A ............................................................................... 12

Fed. R. Civ. P. 56(a) .................................................................................... 1

Federal Rule of Appellate Procedure 4 ........................................................ 1

## STATEMENT OF RELATED CASES

Counsel is not aware of any prior or related appeals.

## JURISDICTIONAL STATEMENT

Appellant Steven Crump appeals from an order of dismissal with prejudice entered June 2, 2025 by the U.S. District Court for the District of Kansas. App. 259. The district court had subject-matter jurisdiction over his federal claims—including Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132—under 28 U.S.C. § 1331. This Court has jurisdiction over his appeal pursuant to 28 U.S.C. § 1291. In accordance with Federal Rule of Appellate Procedure 4(a), Crump filed a timely notice of appeal on June 30, 2025. App. 261.

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment de novo. *Whitesel v. Sengenberger*, 222 F.3d 861, 866–67 (10th Cir. 2000). Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, this Court "view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving party." *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).

## STATEMENT OF THE ISSUES

I. Whether questions of material fact remain concerning Crump's failure to accommodate claim under the ADA.

II. Whether the district court erred in ruling for Defendants after failing to credit his record evidence and holding that a wheelchair and a back brace are medical treatment rather than disability accommodations.

## STATEMENT OF THE CASE[1]

On July 4, 2023, law enforcement shot Steven Crump with a shotgun with a non-lethal round and released a K-9 Unit that bit him on his left leg. App. 235. An ambulance took him to the hospital and law enforcement took him from there to be incarcerated at the Johnson County Adult Detention Center (JCADC). *Id.*

The parties dispute much of what happened to Crump over the next thirteen months at JCADC. App. 235–243. Many of those disputes focus on the medical treatment that Crump did or did not receive and its adequacy in treating his injuries, especially to his back. *Id.* The disputes also extend, however, to the way that JCADC did or did not accommodate his disabilities.

---

[1] As noted above, this Court must "view the evidence and dra] reasonable inferences therefrom in the light most favorable to the nonmoving party," which Crump is here. *Simms*, 165 F.3d at 1326.

The day he entered JCADC, staff provided Crump a wheelchair—purportedly not because of his back or leg injury but because of blisters on his feet. App. 201. Because of his wounds, they also placed him in medical isolation. *Id.* Three days later, they took away his wheelchair and returned him to general population with no restrictions. *Id.* He was still not able to walk without pain because of his back injury. App. 212; App. 220; App. 229. He limped around the facility for five months before staff provided him a cane after many requests. *See* App. 208; App. 224. At the same time, jail staff also arranged for him to have a wheelchair but only on trips to court and, even then, only for parts of the travel. App. 219. The district court reviewed officer body-camera footage of one of these trips and noted that Crump was visibly in pain while walking. App. 250

Crump also regularly requested the accommodation of an extra mattress to accommodate his back injury. He requested an extra mattress twice in October 2023, once in February 2024, and again in April 2024 "to help alleviate the hard pressure on [his] spine." App. 208–09; App. 206–07; App. 212. He was not satisfied with the responses. In February 2024, for instance, staff denied his request by reviewing his chart from seven months prior and saying he did not have a back injury. App. 212. He could not sleep more than one hour per day because of the pain. App. 204. He described his bed as a "solid bunk" and his unit-mate described it as a "wet soiled mattress." App. 176; App. 229.

Crump also filed grievances to gain access to a handicapped accessible cell and an accessible shower. Crump testified that in July 2023 he was arguing with the jail administration and medical staff over access to a medical shower. App. 222. Unit-mate O'Keefe testified that he observed several staff members deny Crump a handicapped shower and heard staff members talk about the jail administration denying him access to a handicapped shower even though they could see he required it. App. 229. In August 2023, Crump submitted a medical request explaining that medical staff had told security staff that he did not need a handicapped shower even though he did need the railings. App. 180. Crump explained to the district court that he had been barred from the handicapped shower for months but that a sympathetic staff member had allowed him to shower when he was on duty; when the staff member was transferred, Crump went chunks of time without showering. App. 75. Medical staff wrote back that he was not permitted to use the handicapped shower. App. 181. After his three-day stay in medical segregation upon entering JCADC, he never again stayed in a handicapped accessible cell. App. 139. Crump similarly requested and was denied a back brace. App. 140; App. 206; App. 214–15.

Crump filed suit against a number of defendants for his treatment at JCADC, which the district court characterized in two groups as the "Johnson County Defendants and the VitalCore Defendants," the latter being a private corporation that provided services to the former. App. 233. Both groups filed motions for summary

judgment and Crump opposed. App. 234. The district court noted that Crump "failed to comply with D. Kan. Local R. 56.1(b), which requires a concise statement of the disputed material facts." App. 234 at n.1. The court also noted, however, that Crump "proceeds pro se and is afforded some leniency in his filings," and therefore the court considered facts from the evidence Crump submitted in opposing summary judgment. App. 234–35 n.1. That evidence is collected at Docket Number 183.[2]

The district court granted summary judgment to all Defendants. App. 258. As relevant here, the district court held in a single paragraph of analysis that Crump lacked a claim under the ADA for three reasons. App. 256. First, although Crump's "request to use a handicapped shower was initially denied, it was ultimately granted the next day." *Id.* Second, Crump provide[d] no evidence beyond his assertions about inmates being made to walk to receive medication or that he was denied a handicapped cell." *Id.* Finally, Crump's "claim that he was denied a back brace and wheelchair are the sort of medical decisions that do not ordinarily fall within the scope of the ADA." *Id.* (internal quotation marks omitted).

Crump timely appealed. App. 261.

[2] Because Crump, operating *pro se*, did not validly authenticate all of his statements or records, the district court had him do so separately at Docket Number 183. *See* App. 68–70. That material is therefore the source of many of his disputed facts. *See* App. 73 (swearing under penalty of perjury that the information that he submitted in Docket Number 183 is true).

## SUMMARY OF ARGUMENT

Crump qualified as having a disability under the ADA's extremely lenient standard. The record showed that he had substantial limitations in his ability to conduct major life activities, including walking, bathing, bending, and sleeping. These limitations in turn limited his access to public services including mobility, hygiene, and a safe place to sleep. He requested accommodations that Defendants repeatedly denied him; the reasonabless of such denials are generally a jury question and should have been treated that way here. And given the notice Defendants were on, those same fact questions remain as to whether Defendants were deliberately indifferent.

The district court's grant of summary judgment to Defendants as to Crump's ADA claims was therefore in error. It reached its conclusion, first, by failing to credit Crump's evidence and, second, by considering paradigmatic disability accommodations like a wheelchair as medical treatment and therefore outside the scope of the ADA. This Court should reverse.

## ARGUMENT

### I. Questions of Material Fact Remain on Whether Crump Has a Claim Under the ADA for Failure to Accommodate.

A plaintiff in a Title II ADA claim must demonstrate that "(1) he is a qualified individual with a disability, (2) who was excluded from participation in

or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007). Crump satisfied each prong of that test, some several times over.

*a) Crump qualified as having a disability.*

The ADA sets forth three ways to qualify as disabled: (1) having "a physical or mental impairment that substantially limits one or more major life activities of [the] individual"; (2) having a "record of such an impairment"; or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1). Under the first prong, often referred to as "actual disability," Crump established that his physical impairments—including spinal and leg injuries, nerve damage, and debilitating pain—substantially limited several of his major life activities including standing, walking, and sleeping.

In 2008, Congress rejected past precedent from the Supreme Court that had imposed a high bar on qualifying disabilities under the ADA and sought to "restore the intent and protections of" the ADA through superseding legislation. ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). Congress passed the ADA Amendments Act (ADAAA), which broadened the ADA's definition of disability. *Id.* In the "Findings" section of the ADAAA, Congress stated:

> (4) the holdings of the Supreme Court in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) and its companion cases have narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect;
> (5) the holding of the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) further narrowed the broad scope of protection intended to be afforded by the ADA;
> (6) as a result of these Supreme Court cases, lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities;
> (7) in particular, the Supreme Court, in the case of *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), interpreted the term "substantially limits" to require a greater degree of limitation than was intended by Congress.

*Id.* This Court has recognized that Congress "reverse[d] course … pass[ing] the ADAAA with the stated goal of ensuring that '[t]he definition of disability … be construed in favor of broad coverage.'" *Adair v. City of Muskogee*, 823 F.3d 1297, 1305 (10th Cir. 2016). Congress further elaborated under the "Purposes" section of the Act that a primary aim was:

> to convey congressional intent that the standard created by the Supreme Court in the case of *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) for "substantially limits", and applied by lower courts in numerous decisions, has created an inappropriately high level of limitation necessary to obtain coverage under the ADA, to convey that it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.

42 U.S.C. § 12101(b). The ADAAA also established a rule of construction that the definition of disability "shall be construed in favor of broad coverage of individuals

under this Act, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A).

The ADAAA authorized the Attorney General to issue implementing regulations. *See* 42 U.S.C. § 12134; *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 582-83 (1999) ("Because the Department [of Justice] is the agency directed by Congress to issue regulations implementing Title II [of the ADA], its views warrant respect."). These regulations reinforced the breadth of the Act's new definition of a qualifying disability: "The definition of 'disability' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 28 C.F.R. § 35.108(a)(2)(i). As for the word "major" in "major life activity," it is not to be "interpreted strictly to create a demanding standard." 28 C.F.R. § 35.108(c)(2)(i). Rather, whether "an activity is a major life activity is not determined by reference to whether it is of central importance to daily life." 28 C.F.R. § 35.108(c)(2)(ii).

The regulation's rules of construction for the term "substantially limits" further detail how broadly courts should interpret a qualifying disability. "Substantially limits" was not intended to be a "demanding standard" but instead should be interpreted "broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 28 C.F.R. § 35.108(d). The regulations made clear that the primary analysis under ADA claims should be "whether public

entities have complied with their obligations and whether discrimination has occurred" rather than "the extent to which an individual's impairment substantially limits a major life activity." *Id.* An impairment constitutes a qualifying disability if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population," and it need not "prevent," or even "significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.* No "extensive analysis" is necessary to resolve the "threshold issue of whether an impairment substantially limits a major life activity," and the evaluation "of an individual's performance of a major life activity" compared to the general population "usually will not require scientific, medical, or statistical evidence." *Id.*

The ADA provides a non-exhaustive list of statutorily defined "major life activities," including "caring for oneself," "sleeping," "walking," "standing," and "bending." 42 U.S.C. § 12102(2)(A). Crump introduced credible evidence that he was substantially limited in all of these activities while imprisoned in JCADC. He provided the court a litany of contemporaneous evidence that he was limited in his ability to walk and stand. App. 208; App. 224; App. 229; App. 250. His limited access to a handicapped-accessible shower limited his ability to "car[e] for" himself. App. 222; App. 229. He was also substantially limited in his ability to sleep. App. 208–209; App. 206–07; App. 212. Defendants may contest just how limited Crump

was, but there is no disputing that Crump created a genuine dispute of material fact on whether he was limited in these major life activities under the lenient standard of the ADAAA.

*b) Crump lacked meaningful access to programs, services, and activities.*

As a result of Defendants' failures to accommodate, Crump lacked meaningful access to programs, services, or activities, including mobility, hygiene, and a safe place to sleep. In the context of prisons and jails, "programs, services, and activities" includes virtually everything the facility offers, from dining to visitation to educational programming. *See, e.g., Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1068 (9th Cir. 2010) (holding that "the fundamentals of life, such as sustenance, the use of toilet and bathing facilities, and elementary mobility and communication" inside a prison all constitute a public entity's programs or services).

The Department of Justice has issued regulations under Title II of the ADA that require prisons to "ensure that each inmate with a disability is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing." *Id.* DOJ explained in releasing these regulations that "[i]t is essential that corrections systems fulfill their nondiscrimination and program access obligations by adequately addressing the needs of prisoners with disabilities, which include, but are not limited to … devices such as a bed transfer or a shower chair,

and assistance with hygiene methods for prisoners with physical disabilities." 28 C.F.R. Pt. 35, app. A; *see also Dinkins v. Corr. Med. Servs.*, 734 F.3d 633, 634–35 (8th Cir. 2014) ("[D]enial of meals and adequate housing by reason of [plaintiff's] disability can form the basis for viable ADA … claims."); *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1224 n.44 (9th Cir. 2008) (determining that "[p]roviding inmates with appropriate and adequate bedding and bathroom facilities are 'services' of the jail" for purposes of the ADA).

The jail's denial of a wheelchair and a cane for months at a time when he was in terrible pain without them impeded his meaningful access to "mobility." App. 208; App. 212; App. 220; App. 224. App. 229; *see also United States v. Georgia*, 546 U.S. 151, 157 (2006) (listing "mobility" as a service under Title II of the ADA). This mobility limitation, in turn, limited him from accessing other services in the prison environment. An inability to access a handicapped shower limited his access to hygiene. App. 222; App. 229; *see Georgia*, 546 U.S. at 157 (listing "hygiene" as a service under Title II of the ADA). The lack of an accommodation for sleeping deprived him meaningful access of a safe place to sleep, another service under the ADA. App. 208–209; App. 206–07; App. 212; *see Pierce*, 526 F.3d at 1224 n.44; 28 C.F.R. § 35.152(b)(3).

*c) Crump introduced record evidence that Defendants failed to accommodate his disabilities.*

If a defendant is aware that an individual has a qualifying disability and requires an accommodation, the defendant is required to provide reasonable modifications.[3] *Robertson*, 500 F.3d at 1196–97. The entity must be aware that the modification is necessary, either because "the individual (or someone else) has informed the entity of the disability" or because "that disability is obvious." *Id.* Title II's implementing regulations require correctional facilities to "implement reasonable policies, so as to ensure that every prisoner with a disability is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing." 28 C.F.R. § 35.152(b)(3). "Whether an accommodation is reasonable under the ADA is a mixed question of law and fact." *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004). Mixed questions of law and facts are typically to be "resolved by juries." *United States v. Gaudin*, 515 U.S. 506, 512 (1995).

Crump repeatedly put Defendants on notice of his need of disability accommodations, including a wheelchair, a cane, a second mattress, and a back brace. Defendants, in turn, repeatedly and explicitly denied him both his requested accommodations and any other. Even if a factfinder could find that Defendants'

---

[3] Title II uses the term "reasonable modification" in place of the more familiar term "reasonable accommodation" from Title I, but "[i]n Title II cases, this Court has used the [two] terms interchangeably." *Robertson*, 500 F.3d at 1195 n.8 (10th Cir. 2007).

actions (and inactions) were reasonable, this is not the rare case where the record makes the reasonableness of the modifications clear as a matter of law.

*d) Fact questions remain over whether Defendants were deliberately indifferent under the ADA.*

To obtain damages under the ADA, this Court requires a plaintiff to allege intentional discrimination. The standard for intentional discrimination under the ADA, however, is not animus-based discrimination but instead deliberate indifference. In ADA cases, "[t]he test for deliberate indifference in the context of intentional discrimination comprises two prongs: (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that . . . likelihood." *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1229 (10th Cir. 2009). "Intentional discrimination does not require a showing of personal ill will or animosity toward the disabled person." *Id.* at 1228. "[A] public entity does not 'act' by proffering just any accommodation: it must consider the particular individual's need when conducting its investigation into what accommodations are reasonable." *Id.* at 1229. As described above, Defendants were repeatedly put on notice that a violation of the ADA was substantially likely and failed to act upon that likelihood.

## II. The District Court Erred in Granting Summary Judgment to Defendants.

Despite Crump's record evidence establishing questions of material fact as to his ADA claim, *see supra*, the district court granted summary judgment to Defendants. It did so in three sentences providing three separate bases for three different sets of record evidence. First, the court wrote, the "record reflects that although Plaintiff's request to use a handicapped shower was initially denied, it was ultimately granted the next day." App. 256. Next, the court wrote, Crump "provides no evidence beyond his assertions about inmates being made to walk to receive medication or that he was denied a handicapped cell." *Id.* Finally, "Plaintiff's claim that he was denied a back brace and wheelchair are the 'sort of medical decisions' that "do not ordinarily fall within the scope of the ADA." *Id.* The first two record arguments are incorrect. So is the final legal argument.

a) *Crump put forth evidence contesting that he lacked a handicapped shower for only a single day.*

.

Crump testified that in July 2023 he was arguing with the jail administration and medical staff over access to a medical shower. App. 222. A fellow prisoner, Kain O'Keefe, testified that he observed several staff members deny Crump a handicapped shower and heard staff members talk about the jail administration denying him access to a handicapped shower even though they could see he required it. App. 229. In August 2023, Crump submitted a medical request explaining that medical staff had told security staff that he did not need a handicapped shower. App. 180 Medical staff wrote back that he was not permitted to use the handicapped

shower. App. 181. Crump also noted that he had been barred from the handicapped shower for months but that a sympathetic staff member had allowed him to shower when he was on duty; when the staff member was transferred, Crump went chunks of time without showering. App. 75. This record evidence supports Crump's claim that he was denied meaningful access to bathing at various times throughout his incarceration and not just on a single occasion.

b) *Crump put forth evidence that he was forced to walk to obtain medication and lacked access to a handicapped cell.*

Testimony that "is based upon personal knowledge and set[s] forth facts that would be admissible in evidence, is legally competent to oppose summary judgment, irrespective of its self-serving nature." *Sanchez v. Vilsack*, 695 F.3d 1174, 1180 n.4 (10th Cir. 2012). "Even standing alone, self-serving testimony can suffice to prevent summary judgment." *Greer v. City of Wichita, Kansas*, 943 F.3d 1320, 1325 (10th Cir. 2019). "The self-serving nature of a sworn statement 'bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact.'" *Janny v. Gamez*, 8 F.4th 883, 900 (10th Cir. 2021) (quoting *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999)).

The court gave no explanation why Crump's statements were insufficient to create a fact question on their own accord as to his having to walk to access services at the prison and to not having access to a handicapped cell. *See* App. 139. Indeed, Defendants' argument, disputed by Crump, is that he did not require such

accommodations, not that he received them. And objective record evidence produced by Defendants supports Crump's claims. *See, e.g.*, App. 201 (Crump's housing records noting three days into his incarceration that he was "Return[ed] to General Population: no housing restrictions.").

c) *Crump's ADA claims sound in disability accommodation and not medical malpractice.*

The district court cited to this Court's opinion in *Fitzgerald v. Corrections Corporation of America* in concluding that the denial of a back brace and a wheelchair are outside the scope of the ADA because they are medical decisions rather than disability accommodation. 403 F.3d 1134, 1144 (10th Cir. 2005); App. 256. In *Fitzgerald*, this Court analyzed an ADA claim brought by a prisoner who had broken his leg against a physician who had recommended to his prison that surgery was the best option but that another acceptable option was to do nothing. *Id.* at 1137. This Court held that "neither the ADA nor the Rehabilitation Act provide remedies for alleged medical negligence." *Id.* at 1144. In other words, an incarcerated plaintiff cannot make an end-run around the Eighth Amendment and medical malpractice tort law by calling his medical issue a disability, "medical care" the service he sought meaningful access to, and negligence by medical providers the unreasonable accommodation that denied him access to the service of medical care.

There are compelling reasons to interpret this principle narrowly. Namely, its origins in *Bryant v. Madigan* reaching its conclusion by using an outdated mode of

statutory interpretation. 84 F.3d 246 (7th Cir. 1996) Judge Richard Posner in *Madigan* interpreted the ADA using "judgemade exceptions" to statutory text in order to "avoid absurdity," and speculated about what Congress could "really have intended" the ADA to mean. *Id.* at 249. Today, of course, courts reject judicially-invented exceptions based on policy preferences and instead interpret statutes according to the ordinary meaning of their plain text. *See, e.g., Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1747 (2020) ("Nor is there any such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception. Instead, when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule."); *Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067, 2073 (2018) ("It is not our function to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have intended.") (internal quotation marks omitted); *Magwood v. Patterson*, 561 U.S. 320, 334 (2010) ("We cannot replace the actual text with speculation as to Congress' intent.").

While the rule this Court articulated in *Fitzgerald* has been adopted by several other circuit courts, these same courts also carefully limit its application. Courts have made clear that the judicially created and atextual exception to the ADA applies only to claims brought specifically because of poor medical care. Courts err when they misidentify an allegation that a prison failed to accommodate a disability as an

allegation that staff failed to cure an injury—a mistake that causes the unwritten exception to swallow the statute whole.

In a recent Third Circuit case, for example, a prisoner with leg braces brought an ADA claim alleging that he could not safely get in and out of a prison shower. *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 288 (3d Cir. 2019). The district court dismissed his claim, citing this distinction. *Id.* at 290. The Third Circuit reversed, as "complaints about not being provided an accessible shower are not allegations of medical malpractice or disagreements about medical treatment. They are requests for reasonable accommodations so that inmates with disabilities can take a shower—just like able-bodied inmates" *Id.* at 291.

The Ninth Circuit has reversed district courts for making this same error several times in the past few years. First, in *Munoz v. California Department of Corrections and Rehabilitation*, the plaintiff was placed on a top bunk despite a history of knee problems. 842 F. App'x 59, 62 (9th Cir. 2021). The district court held that such placement was not a disability accommodation but rather medical treatment and therefore excluded from the ADA. The Ninth Circuit disagreed, holding that "Munoz does not argue he was denied adequate treatment for his knee injuries, only that he was denied an accommodation for his disability." *Id.*

In *Barker v. Osemwingie*, a plaintiff sued after he was injured by two prison officials who used a device to transfer him from his wheelchair to his toilet. No. 20-

15503, 2021 WL 5564625, at *1 (9th Cir. Nov. 29, 2021). The magistrate judge recommended dismissing his Title II claim because his claim purportedly addressed the adequacy of his medical care. *Barker v. Osemwingie*, No. 2:16-CV-3008, 2017 WL 3454443, at *4 (E.D. Cal. Aug. 11, 2017), *report and recommendation adopted*, No. 2:16-CV-3008, 2017 WL 6512882 (E.D. Cal. Dec. 20, 2017). The Ninth Circuit reversed, holding that "the district court improperly relied on *Simmons*" because "[t]ransferring an inmate from a wheelchair to the toilet is an accommodation to provide access to toileting services, rather than medical treatment for a disability." *Barker*, 2021 WL 5564625, at *1; *see also Morris v. California*, No. 21-16059, 2022 WL 2901730, at *1 (9th Cir. 2022) (reversing a district court's conclusion that denial of a wheelchair and transfer to a wheelchair-accessible facility was medical care and therefore outside the scope of the ADA).

The present case too is not within the purview of the rule from *Fitzgerald*. A wheelchair does not "treat" a back injury, and a failure to provide one is not medical malpractice. It is no more medical treatment or less an accommodation than the installation of a wheelchair ramp outside a prison building or handrails in a shower. Instead, a wheelchair would have accommodated Crump's disability by allowing him to access jail services—just like an able-bodied prisoner, and as the ADA requires.

The fact that a medical official made the determination that an accommodation was or was not appropriate does not change the analysis. For obvious reasons, medical officials are often the ones to decide whether prisoners have a qualifying disability, the implications of that disability, and what accommodations are necessary and appropriate. This does not render any accommodation they approve or deny into medical treatment that is outside the scope of the ADA. As the Ninth Circuit held, "[t]o accept [the] position that the involvement of a doctor removes all prison accommodations decisions from the ADA's reach would undermine the Supreme Court's recognition that Title II of the ADA applies to prisons." *Munoz*, 842 F.App'x at 62.

Although the ADA and RA do not provide a cause of action for medical malpractice, that does not show that all medical-adjacent decisions are per se unreviewable. Bryant was motivated by a concern that, absent such an exception, the ADA would become an all-encompassing substitute for state medical-malpractice law in the prison context. *See Bryant*, 84 F.3d at 248–49. The court concluded that Congress could not have intended the ADA to serve as "an end run around" the Eighth Amendment jurisprudence that had "labored mightily to prevent the transformation of the … cruel and unusual punishments clause into a medical malpractice statute for prisoners." *Id.* at 249. This concern has nothing to do with the identity of the decision-makers behind the challenged conduct, but rather the

substance of the underlying right. The district court erred by granting summary judgment to Defendants on these grounds.

## CONCLUSION

Crump respectfully requests this Court to reverse the trial court's grant of summary judgment as to his ADA claims and remand to the district court.

## STATEMENT REGARDING ORAL ARGUMENT

Crump requests oral argument. This case presents several complex legal issues and the district court did not thoroughly address them below. It also presents a thorny record as the result of one of the parties being uncounseled and incarcerated.

Respectfully submitted this 8th day of October, 2025.

*/s/ Samuel Weiss*

Samuel Weiss
RIGHTS BEHIND BARS
1800 M Street NW Front 1 #33821
Washington, DC 20033
(202) 455-4399
sam@rightsbehindbars.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(A) and (B)(i)(ii) and contains, excluding the parts of the document exempted by Fed. R. App. P. 32(f), 5,270 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font size and Times Roman.

Date: October 8, 2025

*/s/ Samuel Weiss*
Samuel Weiss

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that:

- All required privacy redactions have been made per 10th Cir. R. 25.5.
- If required to file additional hard copies, those documents will be identical to the ECF submission.
- The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program.

Date: October 8, 2025

*/s/ Samuel Weiss*
Samuel Weiss

# CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: October 8, 2025

*/s/ Samuel Weiss*
Samuel Weiss

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

STEVEN CRUMP,

*Plaintiff,*

v.

JOHNSON COUNTY BOARD OF COMMISSIONERS, et al.,

*Defendants.*

Case No. 24-3036-EFM

**MEMORANDUM AND ORDER**

Pro se Plaintiff Steven Crump brings this suit against numerous Defendants seeking redress for inadequate care while he was confined in the Johnson County Adult Detention Center ("JCADC"). In this order, the Court will refer to two categories of Defendants (defined later): the Johnson County Defendants and the VitalCore Defendants. There are eleven pending motions. First, the Johnson County Defendants filed a Motion for Summary Judgment (Doc. 83). Second, Plaintiff filed a Motion for Summary Judgment (Doc. 90). Third, Plaintiff filed a Motion to Demand Default Judgment (Doc. 93). Fourth, Plaintiff filed a Motion to Demand Partial Summary Judgment (Doc. 97). Fifth, the VitalCore Defendants filed a Motion for Summary Judgment (Doc. 114). Sixth, the Johnson County Defendants filed a Motion to Strike Plaintiff's Motion for Summary Judgment (Doc. 123). Seventh, Plaintiff filed a Motion to Strike the Johnson County Defendants' Amended Complaint (Doc. 131). Eighth, Plaintiff filed a Motion to Strike the VitalCore Defendants' Amended Complaint (Doc. 132). Ninth, the Johnson County Defendants filed a Motion to Strike Plaintiff's Notice (Doc. 186). Tenth, the Johnson County Defendants filed a Motion for Leave to File Surreply in Support of their Motion for Summary Judgment (Doc. 187).

And eleventh, Plaintiff filed a Motion to Strike the Johnson County Defendants' Motion to Strike and Motion for Leave to File Surreply (Doc. 188). For the reasons stated herein, the Court denies Plaintiff's Motions for Summary and Default Judgment. The Court grants the Johnson County Defendants' Motion for Summary Judgment and the VitalCore Defendants' Motion for Summary Judgment. The Court denies the remaining motions as moot.

## I. Factual and Procedural Background

### A. The Parties

Plaintiff names several Defendants that can be divided into two categories: the Johnson County Defendants and the VitalCore Defendants. The Johnson County Defendants include the Johnson County Board of County Commissioners ("BOCC"); Sheriff Calvin Hayden, Johnson County Sheriff; and the following Johnson County Sheriff's Office employees: Deputy Salgado, Deputy Bell, Sergeant Cooley, Deputy Andrews, Captain M. Levin, Lieutenant M. Weaver, Deputy King, and three unnamed Sergeants.

The VitalCore Defendants include VitalCore Health Strategies, a company contracted to provide healthcare services at JCADC; Viola Riggins, CEO of VitalCore; Jennifer Ehrlich, Vice President of VitalCore; N.B., Medical Director and Head Health Administrator; and the following employees or medical providers: Dr. Danny Stanton, Supervisor Becky, Tiffany McRoberts, Nurse Caryn Kunz; Nurse Kathleen Calloway; Laura Neely; an unknown paramedic and medical provider; and six other unidentified medical staff.

### B. The Uncontroverted Facts[1]

On July 4, 2023, after an altercation with law enforcement, Plaintiff was arrested by the Olathe Police Department for aggravated assault on a law enforcement officer. To effectuate

[1] In responding to the Motions for Summary Judgment, Plaintiff failed to comply with D. Kan. Local R. 56.1(b), which requires a concise statement of the disputed material facts. Plaintiff neither controverted Defendants'

Plaintiff's arrest, officers used a bean bag round fired from a shotgun which hit Plaintiff in the middle of his lower back. Officers also released a K-9 unit that bit Plaintiff on the left calf. After Plaintiff was arrested, he was transported by ambulance to the Olathe Medical Center ("OMC"). Plaintiff was treated at OMC and released that same day. After he was released from OMC, Plaintiff was transported to JCADC for booking.

In the early morning hours of July 5, 2023, Plaintiff underwent a medical screening as part of the JCADC booking process. This medical screening noted that Plaintiff had contusions on his back from the bean bag round, staples over the dog bite wound, and blisters on the bottom of his feet. Plaintiff was immediately prescribed several medications including an antibiotic and ibuprofen. That same day, Plaintiff was also issued a wheelchair for use while the blisters on his feet healed. Plaintiff was placed in medical segregation while he used the wheelchair.

On July 8, 2023, medical staff requested that Deputy King ask Plaintiff if he would like to keep the wheelchair. Plaintiff responded that he would return the wheelchair to get out of medical segregation.

Plaintiff was regularly provided wound care treatment for the dog bite in his calf. On July 14, 2023, after positive healing signs, some of the staples in Plaintiff's calf were removed. On July 18, 2023, the remaining staples were removed. Plaintiff continued to receive wound care treatment for his calf injury, including regular changing of wraps and cleansing. On August 12, 2023, medical staff determined that Plaintiff's calf was healing absent any infection.

---

statement of facts, nor did he include his own statement of facts. As such, the facts in this section are taken from the Defendants' briefs supporting their motions for summary judgment. However, because Plaintiff proceeds pro se and is afforded some leniency in his filings, the Court has included and considered some facts from the attachments Plaintiff submitted in opposing summary judgment.

On July 12, 2023, Plaintiff filed a medical request indicating that he was shot in the spine, was having major back pain shooting through his hip and legs and was experiencing some dizziness. Plaintiff's pain medication was increased that same day.

On July 14, 2023, Plaintiff filed a grievance and a medical request for a diagnostic scan of his back. Plaintiff was treated in sick call.

On July 18, 2023, Plaintiff filed a medical request inquiring when his doctor visit was scheduled and requesting a sleep aid. The next day, medical staff responded that no appointment was scheduled but that a doctor was tasked with reviewing Plaintiff's chart.

On July 20, 2023, Plaintiff requested a refill of his pain medication and was seen in sick call. That same day Ms. Neely annotated in Plaintiff's record that his wheelchair use would be discontinued because the blisters on his feet had healed, and he had been walking to his medical appointments.

On July 22, 2023, Plaintiff filed a medical grievance stating that it had been 18 days since he was shot in the spine, and he had not been treated for his injuries. On August 2, 2023, Nurse N.B. responded to this medical grievance, outlining the treatment he had received thus far and concluding that his visits and treatment were appropriate. Treatment for his back injury included pain medication, an increase in pain medication, and prescription of a muscle relaxer.

On July 29, 2023, Plaintiff filed a medical request for a refill of his muscle relaxer for his back stating that the muscle relaxer worked. That same day Plaintiff's prescription was renewed.

On July 31, 2023, a thoracic/lumbar x-ray was ordered because Plaintiff continued to report back pain even after his pain medication had been increased and he had been prescribed a muscle relaxer.

On August 13, 2023, Plaintiff filed a medical request indicating his muscle relaxer prescription had run out. His prescription was refilled that same day.

On August 14, 2023, Plaintiff's spine was x-rayed. The x-rays provided poor visualization, so a CT scan was ordered on August 18, 2023.

On August 30, 2023, Plaintiff filed a medical request that he be permitted to use a handicapped shower. The same-day response denied his request. However, on September 1, 2023, medical staff requested that Plaintiff be allowed to use a handicapped shower with support bars.

On September 9, 2023, Plaintiff filed a medical request for a second opinion on his back injury. Medical staff responded the same day encouraging Plaintiff to discuss this with his provider at his next chronic care appointment.

On October 10, 2023, Plaintiff underwent the CT scan to determine if he suffered any spinal injuries. The imaging showed no fractures or malalignment.

On October 24, 2023, Plaintiff filed a medical grievance to request a second mattress and a cane. After reviewing Plaintiff's treatment history, the medical staff determined that he did not meet the qualifications for a second mattress or a cane.

On October 29, 2023, Plaintiff complained of water and black mold in his cell. JCADC staff investigated and immediately moved Plaintiff to a different cell.

On November 7, 2023, Plaintiff had a follow-up appointment with medical staff regarding his back pain. Notes from this appointment indicate that the CT and x-rays were negative for acute osseous abnormalities and that Plaintiff was making little progress with the exercises and instructions provided by medical staff. After this appointment, Plaintiff was approved for the use of a cane.

On November 16, 2023, Plaintiff was recommended to undergo a muscle rub and was prescribed Dynarub for twenty-one days.

On November 22, 2023, Plaintiff attended a medical appointment in which he complained that his lower left leg tendon had detached. After evaluation, medical staff assured Plaintiff that his ability to move his foot both laterally and medially proved that his tendon was not detached.

On November 27, 2023, in response to a medical request, medical staff indicated that Plaintiff would be approved for the use of a wheelchair for his court appearance on December 6, 2023.

On December 19, 2023, Plaintiff filed a medical request related to his back pain and requested that a provider recheck his injury through the use of an x-ray or CT scan. On December 20, 2023, medical staff responded that he had an upcoming chronic care appointment in a couple of weeks, but that Plaintiff could be seen at sick call before then.

On February 7, 2024, Plaintiff filed a medical request inquiring when his chronic care appointment was scheduled and stating that his pain was getting worse. On February 8, 2024, medical staff responded that this appointment was coming up in the next few months.

On February 8, 2024, Plaintiff filed a medical request to see a spinal specialist. On the next day, medical staff denied Plaintiff's request, stating that they believed they could diagnose and treat Plaintiff's back pain internally.

On February 11, 2024, Plaintiff filed a medical request related to his spine stating that it was not healing. Medical staff responded the next day that he had been seen in sick call and that his case would be reviewed to determine whether further diagnostic imaging was necessary.

On February 13, 2024, Plaintiff filed a medical grievance complaining that he had been denied the use of a wheelchair, had not received an MRI as opposed to a CT scan, and had been

given no medical help. On February 22, 2024, medical staff responded, reciting Plaintiff's treatment history in the facility including 14 physical therapy sessions. Medical staff reviewed the wheelchair request and determined that—because his earlier approval for wheelchair use was related to blisters on his feet that had since healed—he no longer required the use of a wheelchair.

On February 16, 2024, Plaintiff attended another medical appointment complaining of back pain. At this appointment, Plaintiff was informed that the imaging studies showed that Plaintiff had degenerative changes in his spine but that there were no fractures or malalignment.

On February 21, 2024, Plaintiff filed another grievance related to the denial of his wheelchair use. Plaintiff was directed to communicate with the medical team about the use of a wheelchair.

On February 24, 2024, Plaintiff attended a medical appointment again complaining that the tendon in his left ankle was not attached to the bone. Plaintiff was again assured that, because he could move his foot, his tendon was attached; Plaintiff was further encouraged to continue physical therapy exercises.

On February 28, 2024, Plaintiff filed a medical grievance complaining that he had not been provided adequate medical care. In responding to this grievance, medical staff noted that Plaintiff had filed a medical request on the same day he filed his grievance, but that Plaintiff refused to be seen at sick call.

On March 5, 2024, Plaintiff attended a medical appointment complaining of back pain at which the medical provider ordered an MRI of Plaintiff's thoracic and lumbar spine.

On March 20, 2024, Plaintiff requested a back brace. Medical staff did not approve Plaintiff's use of a back brace.

Also on March 20, 2024, Plaintiff complained of chest pain. He was evaluated by medical staff through the use of an EKG. Medical staff identified no symptoms of acute onset, severe distress, abnormal vital signs, hypoxemia, pain with exertion, syncope, dizziness, palpitations or previous chest pain episodes. During the evaluation, Plaintiff indicated his chest pain had subsided.

On April 16, 2024, an MRI was conducted on Plaintiff's thoracic and lumbar spine.

On April 20, 2024, Plaintiff complained about standing water in his cell. He was immediately moved to a new cell by JCADC staff.

On April 23, 2024, Plaintiff filed a medical grievance requesting a second mattress and a back brace. That same day, Plaintiff attended a medical appointment regarding his back pain. Medical staff reviewed his imaging studies, including the MRI, which found no evidence of fracture or malalignment, but evidence of degenerative arthritis and mild scoliosis. Medical staff opted to continue present treatment, prescribing conditioning and strength exercises.

On April 24, 2024, Plaintiff filed a medical grievance demanding that he be sent to an orthopedic spinal specialist and given a back brace.

On April 25, 2024, Plaintiff attended another medical appointment at which he complained of continued back pain. The notes indicate that Plaintiff insisted he was not getting appropriate care, that his providers were lying, that his spine was separating and twisting, and that if he "moved wrong" he would sever his spine. The medical provider again reviewed the MRI results which indicated "minimal to mild multilevel degenerative change involving the thoracic and lumbar spine," "no acute findings," "no severe stenosis," and "mild s-shaped thoracolumbar scoliosis." Upon physical examination, the provider was unable to palpate or visualize the scoliosis but noted a slightly raised right scapula that could be related to the scoliosis or Plaintiff's use of a cane.

On April 26, 2024, medical staff responded to Plaintiff's April 24, 2024 medical grievance. The response indicated that Plaintiff's medical file had been reviewed and concluded that treatment thus far including imaging studies, pain medication, and physical therapy was appropriate. Plaintiff filed another medical grievance on this same day insisting that his spine was dislocated and that he had been denied all forms of traditional treatment. He demanded treatment by a spine specialist, a back brace, and chiropractic care. On April 30, 2024, medical staff responded that Plaintiff's spine was not dislocated and that his condition was being appropriately addressed without an outside specialist. Further, because his scoliosis was characterized as mild, a back brace was unnecessary.

On April 29, 2024, Plaintiff attended a dental appointment in response to a complaint that his teeth were loose. An examination revealed that his teeth were intact, not loose, there was no redness or swelling in his gums, and that there were no visible abnormalities.

On May 8, 2024, Plaintiff was provided a mouthpiece. Plaintiff requested an appointment to heat up the mouth guard to mold it, but he ultimately refused to attend the appointment.

On May 15, 2024, Plaintiff attended a medical appointment complaining of back pain and insisting that his spine was separated. Medical staff found no evidence of fracture or malalignment, that he was in no acute distress, that his gait was less antalgic, that he did not exhibit any difficulty when climbing onto or off the exam table, that he was able to reach his arm behind his back without difficulty, and that Plaintiff was not tender to palpation of the spine, which showed normal alignment of the spinous processes.

On May 29, 2024, Plaintiff filed a medical grievance demanding the use of a wheelchair for long distance travel and insisting that he had been approved for wheelchair use for long distance travel since November 27, 2023. On that same day, Plaintiff refused to go to his scheduled court

hearing. Staff responded to Plaintiff's grievance on June 27, 2024, indicating that his accommodations were based upon his treatment plan.

On June 3, 2024, Plaintiff filed a grievance stating that he was denied the use of a wheelchair for transport to his court appearance that day. On June 4, 2024, JCADC staff denied Plaintiff's grievance. However, jailhouse staff confirmed that, during transport, Plaintiff was provided a wheelchair for longer distances but was not provided a wheelchair for shorter distances. On June 5, 2024, Plaintiff appealed the response, stating that he was handcuffed in a holding cell for three hours, forced to sit up with his separated spine pinching his nerves. A response to Plaintiff's appeal was provided on June 10, 2024. The response indicated that all proper protocols and procedures were followed and that a wheelchair was provided for the long distance as a courtesy to Plaintiff. On June 12, 2024, Plaintiff filed a second appeal insisting that he was in extreme pain when forced to walk handcuffed with a cane.

On June 5, 2024, Plaintiff attended a medical appointment related to his continued complaints of back pain. Medical staff noted that they had ordered another x-ray for Plaintiff, but that he refused to attend. Plaintiff denied refusing to go to the x-ray.

On June 12, 2024, Plaintiff attended a follow-up appointment for his persistent back pain. At this appointment, the medical provider noted that plaintiff reported blunt force trauma injury to his spine, but that the radiological findings indicated degenerative spinal disease.

On July 10, 2024, Plaintiff attended a medical appointment related to his back pain attributing some of the pain to the use of a belt restraint. Medical staff recommended that JCADC staff use an alternative to the belt restraint for transport.

On August 7, 2024, Plaintiff attended a medical appointment complaining of back pain. Medical staff noted that Plaintiff was not in acute distress. Although he exhibited a mildly antalgic

gait and walked with a cane, he did not appear to have difficulty changing positions from standing to sitting or vice versa.

Throughout this timeframe and at these medical appointments, Plaintiff was prescribed a variety of pain medications, muscle relaxers, and other medications addressing various other complaints. In all, there are 196 documented times Plaintiff visited medical providers or triage. During this same timeframe, Plaintiff refused treatment or medication on 62 occasions.

**C. Procedural Background**

Plaintiff filed suit on March 13, 2024, and a First Amended Complaint on August 23, 2024. In his First Amended Complaint, Plaintiff brought thirteen Counts. At the time of filing, Plaintiff was a prisoner seeking relief against a governmental entity; as such, his Complaint was subject to screening in accordance with 28 U.S.C. § 1915A(a). Only Counts I–V and VII–XII survived screening.

After waiving service of process, all Defendants filed a joint answer on January 13, 2025. The Johnson County Defendants filed their Motion for Summary Judgment on January 22, 2025. A timely response and reply were filed. The VitalCore Defendants filed their motion for Summary Judgment on February 7, 2025. A timely response and reply were filed. These dispositive matters are fully briefed and ripe for the Court's consideration.

## II. Legal Standard

Pro se complaints are held to "less stringent standards than formal pleadings drafted by lawyers."[2] A pro se litigant is entitled to a liberal construction of his pleadings.[3] However, it is not the proper role of a district court to "assume the role of advocate for the pro se litigant."[4]

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[5] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[6] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[7] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[8] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[9] The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[10]

---

[2] *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

[3] *See Trackwell v. U.S. Gov't*, 472 F.3d 1242, 1243 (10th Cir. 2007) ("Because Mr. Trackwell appears pro se, we review his pleadings and other papers liberally and hold them to a less stringent standard than those drafted by attorneys.").

[4] *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[5] Fed. R. Civ. P. 56(a).

[6] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[7] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[8] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[10] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

## III. Analysis

### A. Plaintiff's Motions for Default and Summary Judgment

Plaintiff filed a Motion for Summary Judgment and a Motion for Default Judgment. In both, he asserts that Defendants did not file a timely answer as required by Fed. R. Civ. P. 12(a)(1). According to Fed. R. Civ. P. 4(d)(3), if a defendant returns a waiver of service in a timely fashion, they need not serve an answer to the complaint until 60 days after the waiver request was sent.[11] In computing time to file, "if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next [business day]."[12]

Here, Plaintiff sent a waiver request on November 12, 2024, to all Defendants. Sixty days later—or the last day to timely file an answer—was Saturday, January 11, 2025. Defendants filed a joint answer on January 13, 2025, which was the next business day. As such, Defendants' answer is timely and Plaintiff's motions for summary and default judgment are denied.

### B. Defendants' Motions for Summary Judgment

Many of the grounds for which the Johnson County and VitalCore Defendants move for summary judgment overlap. As such, the Court will address the merits of each motion in numerical order by count. Broadly though, because Plaintiff neither controverts Defendants' facts nor provided his own recitation of facts, Plaintiff's counts do not survive summary judgment.

In moving for summary judgment, the individual Johnson County Defendants assert that they are entitled to qualified immunity on Plaintiff's federal claims. It is well established that "[i]ndividual defendants named in a § 1983 action may raise a defense of qualified immunity."[13]

---

[11] Fed. R. Civ. P. 4(d)(3).

[12] Fed. R. Civ. P. 6(a)(1)(C).

[13] *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 460 (10th Cir. 2013).

"The doctrine of qualified immunity shields public officials . . . from damages actions unless their conduct was unreasonable in light of clearly established law."[14] When the defense of qualified immunity is asserted, the burden shifts to the plaintiff to show: "(1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct."[15] The Court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[16]"If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity."[17] "In determining whether the plaintiff has shouldered this heavy burden, '[the Court] construe[s] the facts in the light most favorable to the plaintiff as the nonmovant.' "[18]

*1. Count I – Fourteenth Amendment Deliberate Indifference*

In Count I, Plaintiff alleges Defendants were deliberately indifferent to Plaintiff's serious medical needs in violation of the Fourteenth Amendment. Specifically, Plaintiff asserts that the Defendants were aware of his injuries but denied him access to qualified medical professionals, denied him adequate medication, and failed to accommodate his injuries. Both the VitalCore and Johnson County Defendants move for summary judgment asserting that Plaintiff's claim is not factually supported. The Court agrees that the uncontroverted facts do not support Plaintiff's deliberate indifference claim.

---

[14] *Id.* (quotations and citation omitted).

[15] *Id.* (citation omitted).

[16] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[17] *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (citation omitted).

[18] *Corona v. Aguilar*, 959 F.3d 1278, 1282 (10th Cir. 2020) (quoting *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015)).

A deliberate indifference claim is rooted in the Eighth Amendment which prohibits "cruel and unusual punishment." "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."[19] And as a pretrial detainee, Plaintiff is afforded protection under the Due Process Clause of the Fourteenth Amendment, which requires that pretrial detainees "are entitled to the same degree of protection regarding medical attention as that afforded convicted inmates under the Eighth Amendment."[20] A deliberate indifference claim contains "both an objective and a subjective component" with respect to each defendant.[21] In the objective analysis, the deprivation must be "sufficiently serious."[22] "A medical condition is 'sufficiently serious' when 'the condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' "[23] To satisfy the subjective component, Plaintiff must show that the "prison official knows of and disregards an excessive risk to inmate health or safety."[24] "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[25] Further, "a complaint that a physician has been negligent in diagnosing or treating a medical condition" is

---

[19] *Helling v. McKinney*, 509 U.S. 25, 31 (1993).

[20] *Frohmader v. Wayne*, 958 F.2d 1024, 1028 (10th Cir. 1992) (citation omitted).

[21] *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

[22] *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1044 (10th Cir. 2022).

[23] *Id.* (quoting *Al-Turki v. Robinson*, 762 F.3d 1188, 1192–93 (10th Cir. 2014)).

[24] *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005) (quoting *Sealock*, 218 F.3d at 1209).

[25] *Id.* (quoting *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir. 1996)).

not an actionable claim under the Eighth or Fourteenth Amendment.[26] And "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."[27]

Plaintiff's allegations in Count I amount to a mere disagreement with the diagnosis and treatment he was provided while at JCADC. Defendants assert that Plaintiff was adequately treated. Plaintiff responds by pointing to photographs of his injuries taken at the time of his arrest and insists that his injuries were of such a nature that a layman could recognize that he needed care. He further asserts that he was never treated for the injuries visible in the photographs. Indeed, these photographs show that, at the time of his arrest, Plaintiff had what appears to be an abrasion or bruise on his back and torn flesh in his calf from a K-9 bite.

Even assuming that Plaintiff met the objective component of the deliberate indifferent standard—that he suffered a serious injury—Plaintiff's extensive attention and treatment records demonstrate that the Defendants did not disregard Plaintiff's injuries. The uncontroverted facts demonstrate that Plaintiff was frequently treated for these injuries and Plaintiff's many other complaints. Plaintiff was provided wound care for the K-9 bite, and the dog bite eventually healed. In response to Plaintiff's complaints about his back, diagnostic imaging—including x-rays, a CT scan, and an MRI—was ordered and reviewed. These diagnostic imaging scans indicated that Plaintiff had scoliosis and degenerative changes in his lumbar and thoracic spine. Treatment for Plaintiff's back injury included pain medication, muscle relaxers, and physical therapy. The grievances Plaintiff submitted reflect that Plaintiff disagreed with the course of treatment he was

[26] *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

[27] *Id.*

provided. But "a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation."[28]

Further, because the Johnson County Defendants assert the defense of qualified immunity on this claim, Plaintiff bears the burden of demonstrating that his clearly established right was violated. As discussed above, Plaintiff's deliberate indifference claim is, at base, a disagreement with the diagnosis and treatment he received while in custody and does not amount to a constitutional violation. To the extent Plaintiff's claim extends to the Johnson County Defendants, they were entitled to "rely on the advice and course of treatment prescribed by medical personnel."[29] As such, the Court grants summary judgment in favor of all Defendants on Count I.

*2. Count II – Fourteenth Amendment Cruel and Unusual Punishment*

In Count II Plaintiff alleges that Defendants violated his Fourteenth Amendment rights by subjecting him to cruel and unusual punishment. Specifically, he alleges that he was forced to walk with a separated spine, restrained and left in an act of torture that left him paralyzed, forced to live in an unclean cell for five months, prescribed harmful medications that caused severe side effects, forced to keep taking harmful medications after he reported that the medications caused him injury, and was left to die while having a heart attack. Defendants move for summary judgment asserting that the facts do not support Plaintiff's claims. The Court agrees that the facts demonstrate that Defendants did not subject Plaintiff to cruel and unusual punishment, but rather appropriately attended to Plaintiff's numerous complaints while he was confined.

Plaintiff asserts that he should have been provided a wheelchair rather than forced to walk. In support of his claim, Plaintiff provided the Court with body camera footage of deputies

---

[28] *Perkins v. Kan. Dept. of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999).

[29] *Est. of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1265 (10th Cir. 2022).

transporting Plaintiff. These videos show that Plaintiff was provided a wheelchair for some portions of transport. Other portions of the video show Plaintiff painfully walking in a belt restraint next to a deputy. Plaintiff claims that he needed a wheelchair because his spine was separated. But except for Plaintiff's statement to that effect, there is no evidence to support his claim. Rather, the several imaging studies demonstrate that he had scoliosis and degenerative changes in his back. The records indicate that Plaintiff's diagnosis did not warrant a wheelchair for the entirety of the transport, but that Plaintiff was provided a wheelchair as a courtesy for longer portions of the transport. Further, the condition for which Plaintiff was initially provided a wheelchair—blisters on his feet—had healed. Plaintiff's claims that he should have been provided a wheelchair instead of being forced to walk with a separated spine are not supported by facts. Consequently, they do not survive summary judgment.

Plaintiff's claim that he was subject to torture by being restrained for a long period of time leaving him paralyzed is likewise unsupported by the record. Again, the body camera footage that Plaintiff provided to the Court shows that Plaintiff was in a holding cell awaiting transport to a court proceeding. The footage then shows Plaintiff walking towards the transport vehicle. Although Plaintiff appears to be in pain when he walks, he is clearly not paralyzed.

Plaintiff's claim that he was forced to live in an unclean cell for five months is also not supported by the record. Plaintiff's housing record demonstrates that on the two occasions that Plaintiff complained about water or mold in his cell, he was immediately moved to a different cell. Much more prolonged and austere confinement conditions have been found not to violate a plaintiff's constitutional protections.[30]

---

[30] *See e.g.*, *Estrada v. Kruse*, 38 F. App'x 498, 498 (10th Cir. 2002) (affirming the district court's finding that the plaintiff was not subjected to cruel and unusual punishment when "he was held for four nights and five days

Plaintiffs claim that he was forced to take harmful medication is also not supported by the record. Rather, the evidence demonstrates that Plaintiff was prescribed numerous medications in response to his frequent complaints. Further, the evidence demonstrates that Plaintiff refused to take his prescribed medication on several occasions. Plaintiff's unsupported claims to the contrary do not survive summary judgment.

Plaintiff's claim that he was left to die while having a heart attack is also not supported by the record. The facts demonstrate that on March 20, 2024, Plaintiff complained of chest pain. At 10:00 pm he was given a full evaluation by medical staff including an EKG. Plaintiff submitted body camera footage of Deputy Bell conducting a check on inmates around 11:30 pm. In that video, Plaintiff can be heard requesting that Deputy Bell call medical because he is having a medical emergency. Deputy Bell tells Plaintiff that he has called medical, but they have already evaluated Plaintiff and that there is nothing more that they can do. As discussed above, that evaluation did not note any abnormal vital signs, observable pain, or any other emergent medical need. Thus, the evidence shows that Plaintiff was not left to die in his cell while having a heart attack, but rather evaluated appropriately upon his complaint of chest pain.

Deputy Bell has asserted the defense of qualified immunity on this claim, and as such Plaintiff bears the burden of demonstrating that Deputy Bell's conduct was unreasonable in light of clearly established law. The video demonstrates that Deputy Bell called medical staff, and the medical staff communicated to Deputy Bell that they had already evaluated Plaintiff. Because Deputy Bell could reasonably "rely on the advice and course of treatment prescribed by medical

---

in a stripped basement intake cell . . . with minimal clothing and bedding, no personal hygiene items, and no cleaning supplies").

personnel,"[31] Plaintiff has not met his burden to overcome Deputy Bell's defense of qualified immunity.

*3. Count III –* Monell *Claim*

In Count III, Plaintiff asserts a *Monell* claim against VitalCore and Sheriff Hayden. Plaintiff asserts that these Defendants maintain policies that result in deliberate indifference to medical needs. Plaintiff specifically asserts that these Defendants fail to train staff to escalate injuries, deny inmates actual pain medication, maintain a "wait and see" policy which prolongs suffering, deny wheelchairs to disabled inmates, require crippled inmates to clean their own cells, and encourage staff to practice beyond their medical capabilities. Defendants move for summary judgment asserting that Plaintiff's broad claims are unsupported by the evidence. The Court agrees with Defendants.

To prevail on a *Monell* claim, a plaintiff must show "(1) a constitutional violation by a municipal employee, (2) the existence of a municipal custom or policy and (3) a direct causal link between the custom or policy and the violation alleged."[32] A plaintiff does not prevail under *Monell* when "there was no underlying constitutional violation by any of its officers."[33] As discussed above, the factual record demonstrates that Defendants responded appropriately to Plaintiff's health concerns and confinement conditions. Plaintiff's unsupported complaints related to the medical care and confinement conditions do not amount to constitutional violations. Without an underlying constitutional violation, Plaintiff's *Monell* claim fails the first prong. Accordingly, Defendants are entitled to summary judgment on Count III.

---

[31] *Est. of Beauford*, 35 F.4th at 1265.

[32] *Douglass v. Garden City Cmty. Coll.*, 543 F. Supp. 3d 1043, 1061 (D. Kan. 2021).

[33] *Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993).

4. *Count IV - § 1983 Supervisory Liability*

In Count IV, Plaintiff asserts a § 1983 supervisory liability claim against Defendants Ehrlich, Becky, Dr. Stanton, Sergeant Cooley, Sergeant Watson, and three unnamed sergeants. He bases this supervisory liability claim upon his alleged inadequate medical care. But supervisory liability is derivative of an underlying constitutional violation committed by a subordinate employee.[34] As discussed above, Plaintiff has failed to establish a violation of his constitutional rights based on inadequate medical care or conditions of confinement. Accordingly, there is no underlying constitutional violation to support a claim of supervisory liability. Therefore, Defendants are entitled to summary judgment on Count IV.

5. *Count V – First Amendment Retaliation*

In Count V, Plaintiff asserts that Defendants retaliated against him for exercising his First Amendment right by filing grievances and this lawsuit. He alleges that VitalCore staff and the Sheriff's office staff prevented him from molding his mouthpiece; Deputy Salgado and Becky conspired to write Plaintiff up and have him falsely imprisoned; and he was medically abandoned.

To make a claim of retaliation under the First Amendment, a plaintiff must show that (1) he was engaged in constitutionally protected activity; (2) defendant's actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that protected activity; and (3) his protected conduct substantially motivated defendant's actions.[35]

Plaintiff's claim fails on prong two—he cannot show that he was injured by Defendants' actions. Plaintiff's allegations that he suffered an injury are either contradicted by the evidence or wholly without support. Regarding the mouthpiece, the evidence demonstrates that Plaintiff was

[34] *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) ("[S]upervisors may be liable for a subordinate's constitutional deprivations under certain circumstances.").

[35] *Douglass v. Garden City Cmty. Coll.*, 652 F. Supp. 3d 1329, 1344 (D. Kan. 2023).

given the opportunity to attend an appointment to mold his mouthpiece, but that Plaintiff failed to attend that appointment. Next, Plaintiff's claim that Deputy Salgado and Defendant Becky conspired to have Plaintiff written up and falsely imprisoned lacks any evidentiary support. Finally, as discussed above, Plaintiff's complaints about the inadequacy of his medical care are contradicted by the evidentiary record. In sum, there is no factual support for prong two of Plaintiff's retaliation claim—Defendants' actions leading to Plaintiff's injury. As such, Plaintiff has not demonstrated that any Defendants retaliated against him for exercising his First Amendment right, and the Court grants summary judgment to all Defendants on Count V.

*6. Count VII – Defamation*

In Count VII Plaintiff makes a defamation claim against the VitalCore Defendants. Specifically, Defendant alleges that medical staff defamed him by claiming that Plaintiff did not have a spinal injury, had the ability to walk without a wheelchair, was not disabled, faked heart problems, threw a rock at police officers while on amphetamines, and was capable of cleaning his cell. Defendants move for summary judgment asserting that Plaintiff's claims are without evidentiary support.

"The elements of a defamation claim are: (1) false and defamatory words; (2) communication to a third party; and (3) resulting harm to the reputation of the person defamed."[36] Here, Plaintiff provides no evidence from which this Court could conclude that any statement identified above was false. As such, the VitalCore Defendants are entitled to summary judgment on Count VII.

[36] *Hobson v. Coastal Corp.*, 962 F. Supp. 1407, 1411 (D. Kan. 1997).

*7. Count VIII – Punitive Damages*

In Count VIII, Plaintiff seeks punitive damages. He alleges that Defendants engaged in reprehensible conduct by dismissing his grievances, isolating and targeting him, and being deliberately indifferent to his medical needs. Punitive damages "are available only for conduct which is 'shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'"[37] Although Plaintiff's grievances were at times denied, the denials were based upon Plaintiff's diagnoses and treatment. There is no evidence that the denials were motivated by an evil intent. Plaintiff's claim that he was isolated and targeted is wholly without support. Finally, as discussed above, Plaintiff's claim that Defendants were indifferent to his medical needs also lacks evidentiary support. Accordingly, the Court grants summary judgment in favor of Defendants on Count VII.

*8. Count IX – Discrimination under the ADA*

In Count IX, Plaintiff claims that Defendants engaged in discrimination in violation of the Americans with Disabilities Act ("ADA"). Specifically, he alleges that VitalCore denied him a handicapped shower, maintains a policy of requiring inmates to walk to medical to receive their medication, denied him a back brace, did not allow him the use of a wheelchair, and did not place him in a handicapped cell. Defendants move for summary judgment asserting that Plaintiff has failed to show that he had a disability or that he was denied any benefit because of that disability.

"To state a claim under Title II of the ADA, a plaintiff must allege: (1) he is 'a qualified individual with a disability'; (2) he 'was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity'; and (3) 'such exclusion, denial of benefits, or discrimination was by reason of

[37] *Searles v. Van Bebber*, 251 F.3d 869, 879 (10th Cir. 2001) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).

the plaintiff's disability.'"[38] "Failure to satisfy any of these prongs defeats an ADA claim."[39] Further, "it is well settled that the ADA does not provide a private right of action for substandard medical treatment."[40]

Plaintiff's claims of discrimination are without support. The record reflects that although Plaintiff's request to use a handicapped shower was initially denied, it was ultimately granted the next day. Plaintiff provides no evidence beyond his assertions about inmates being made to walk to receive medication or that he was denied a handicapped cell. Plaintiff's claim that he was denied a back brace and wheelchair are the "sort of medical decisions" that "do not ordinarily fall within the scope of the ADA."[41] As such, Defendants are granted summary judgment on Count IX.

*9. Count X and XI – IIED and Negligence*

In Count X, Plaintiff asserts an intentional infliction of emotional distress claim against all Defendants. In Count XI, Plaintiff asserts a negligence claim against all Defendants. Defendants move for summary judgment citing that Plaintiff has not complied with the notice requirements under the Kansas Tort Claim Act[42] and has failed to exhaust his administrative remedies.

"It is a longstanding rule that filing a proper notice of a claim is a prerequisite to filing an action . . . against a county or other municipality."[43] "Failure to provide the statutory notice of a claim . . . precludes relief."[44] Until the statutory condition precedent is met, a district court is

---

[38] *Crane v. Utah Dep't. of Corr.*, 15 F.4th 1296, 1312 (10th Cir. 2021) (quoting *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016)).

[39] *Id.*

[40] *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005).

[41] *Id.*

[42] Kan. Stat. Ann. § 12-105b.

[43] *Myers v. Bd. of Cnty. Comm'rs of Jackson Cnty.*, 280 Kan. 869, 127 P.3d 319, 325 (2006).

[44] *Id.*

without subject matter jurisdiction over a claim against a municipality.[45] Indeed, Plaintiff supplies no evidence that he provided the required notice. The Johnson County Defendants fit within the broad definition of "municipality," and Plaintiff has not provided the requisite notice, so the Court lacks subject matter jurisdiction over these state law claims as to the Johnson County Defendants.[46]

The VitalCore Defendants move for summary judgment on the same grounds. However, specifically excluded from the definition of an "employee," is an "independent contractor working for a municipality under contract."[47] VitalCore makes no effort to demonstrate why the Court should consider it an employee of the municipality. In its answer to Plaintiff's Amended Complaint, VitalCore acknowledges that it is contracted to provide healthcare within JCADC. As such, the Court cannot conclude that the notice requirements of K.S.A. § 12-105b are applicable to Plaintiff's claims against the VitalCore Defendants.

VitalCore also asserts that Plaintiff has not exhausted his administrative remedies because he failed to submit a "claim for personal injury . . . to the facility and secretary of corrections within 10 calendar days of the claimed personal injury."[48] Exhaustion of administrative remedies is not discretionary, but rather a precondition to bringing suit.[49] Here, Plaintiff has presented no evidence that he presented a claim to the secretary of corrections. As such, the Court concludes that Plaintiff has not exhausted his administrative remedies on these claims against the VitalCore Defendants. Accordingly, the VitalCore Defendants are entitled to summary judgment on Counts X and XI.

---

[45] *Sleeth v. Sedan City Hosp.*, 298 Kan. 853, 317 P.3d 782, 793 (2014).

[46] *Dodge City Implement, Inc. v. Bd. of Cnty. Comm'rs*, 288 Kan. 619, 205 P.3d 1265, 1281 (2009).

[47] Kan. Stat. Ann. § 12-105a(h).

[48] Kan. Admin. Reg. § 44-16-104a(a).

[49] *Sharrock v. Stephens*, 2011 WL 5526444, *2 (D. Kan. Nov. 14, 2011).

In sum, Plaintiff has failed to provide evidence demonstrating any issues of material fact, and Defendants are entitled to judgment as a matter of law. As such, the Court grants summary judgment on all counts in favor of Defendants.

**IT IS THEREFORE ORDERED** that the Johnson County Defendants' Motion for Summary Judgment (Doc. 83) and the VitalCore Defendants' Motion for Summary Judgment (Doc. 114) are **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 90), Motion to Demand Default Judgment (Doc. 93), and Motion to Demand Partial Summary Judgment (Doc. 97) are **DENIED**.

**IT IS FURTHER ORDERED** that the Johnson County Defendant's Motion to Strike Plaintiff's Motion for Summary Judgment (Doc. 123); Plaintiff's Motion to Strike the Johnson County Defendants' Amended Complaint (Doc. 131); Plaintiff's Motion to Strike the VitalCore Defendants' Amended Complaint (Doc. 132); Johnson County Defendants' Motion to Strike Plaintiff's Notice (Doc. 186); Johnson County Defendants' Motion for Leave to File Surreply in Support of their Motion for Summary Judgment (Doc. 187); and Plaintiff's Motion to Strike the Johnson County Defendants' Motion to Strike and Motion for Leave to File Surreply (Doc. 188) are **DENIED AS MOOT**.

**IT IS SO ORDERED**.

Dated this 2nd day of June, 2025.

This case is closed.

Eric F. Melgren

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

# United States District Court

**------------------------- DISTRICT OF KANSAS---------------------------**

**STEVEN CRUMP,**

**Plaintiff,**

**v.** **Case No: 24-3036-EFM**

**JOHNSON COUNTY BRD OF COMMISSIONERS, CLAY HAYDEN, VITAL CORE HEALTH STRATEGIES, (fnu)(lnu)(5), DANNY STANTON, VIOLA RIGGINS, JENNIFER EHRLICH, N.B., BECKY (LNU), TIFFANY McROBERTS, CARYN KUNZ, KATHLEEN CALLOWAY, (fnu)(lnu)(12), LAURA NEELY, (fnu)(lnu)(13), (fnu) SALGADO, (fnu)(lnu)(14), (fnu) BELL, (fnu)(lnu)(15), (fnu)(lnu)(16), (fnu) COOLEY, (fnu) ANDREWS, (fnu)(lnu)(17), M. LEVIN, M. WEAVER, and (fnu) KING,**

**Defendants,**

## JUDGMENT IN A CIVIL CASE

☐ Jury Verdict. This action came before the Court for a jury trial. The issues have been tried and the jury has rendered its verdict.

☒ Decision by the Court. This action came before the Court. The issues have been considered and a decision has been rendered. IT IS ORDERED

that pursuant to the Memorandum and Order issued on June 2, 2025, (Doc. 190) Johnson County Defendants' Motion for Summary Judgment (Doc. 83) and the VitalCore Defendants' Motion for Summary Judgment (Doc. 114) are **GRANTED**.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 90), Motion to Demand Default Judgment (Doc. 93), and Motion to Demand Partial Summary Judgment (Doc. 97) are DENIED.

IT IS FURTHER ORDERED that the Johnson County Defendant's Motion to Strike Plaintiff's Motion for Summary Judgment (Doc. 123); Plaintiff's Motion to Strike the Johnson County Defendants' Amended Complaint (Doc. 131); Plaintiff's Motion to Strike VitalCore Defendants' Amended Complaint (Doc. 132); Johnson County Defendants' Motion to Strike Plaintiff's Notice (Doc. 186); Johnson County Defendants' Motion for Leave to File Surreply in Support of their Motion for Summary Judgment (Doc. 187); and Plaintiff's Motion to Strike the Johnson County Defendants' Motion to Strike and Motion for Leave to File Surreply (Doc. 188) are DENIED AS MOOT.

This Case is Closed.

6/2/2025
Date

SKYLER O'HARA
CLERK OF THE DISTRICT COURT

by: s/ Cindy McKee
Deputy Clerk